## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| EARL LEE SNIDER and | ) | |
| CARMEN NOEL SNIDER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. CIV-05-1367-M |
| | ) | |
| LINCOLN COUNTY BOARD OF COUNTY | ) | |
| COMMISSIONERS, State of Oklahoma, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court are "Defendant Board of County Commissioners of Lincoln County's Motion for Summary Judgment" [docket no. 35], "Defendants' David Neal and Chris Evans' Motion for Summary Judgment" [docket no. 36], and "Defendant A.T. Brixey, Sheriff of Lincoln County, Oklahoma's Motion for Summary Judgment" [docket no. 37], filed August 1, 2006. On August 21, 2006, Plaintiffs filed their responses, and on September 15, 2006, Defendants filed their replies. Based upon the parties' submissions, the Court makes its determination.

## I.   INTRODUCTION[1]

On May 19, 2005, Mr. Snider called the Lincoln County Sheriff's office and reported that property had been stolen from his home. On May 27, 2005, Mr. Snider called the Lincoln County Sheriff's office to report a prowler on his property. Three deputies responded by going to Mr. Snider's home. Mr. Snider told one of the deputies that he suspected his wife of drugging him in order to have sex with other men, that he had videotaped the prowlers but the tapes were not ready for viewing, and that he heard exotic bird noises that he believed were recordings coming from his

---

[1]The following facts are described in the light most favorable to Plaintiffs. Immaterial facts or factual averments not supported by the record are omitted.

trees.  On June 1, 2005, Mr. Snider hired a polygraph examiner to interrogate his wife at their home.

During the interrogation, Mr. Snider discovered boot prints in his backyard, which he suspected

were tracked by a prowler the night before.  He had his mother contact the Lincoln County Sheriff's

office and ask for Deputy Van Zandt.[2]  His mother called him back to tell him there was no such

deputy.  On June 2, 2005, Mr. Snider again called the Sheriff's office, this time complaining that a

deputy had misidentified himself on May 27 and relaying other suspicions he had regarding the

conduct of the deputies.

After the call, Captain Bartlett sent Sergeant Neal to Plaintiff's home to perform a welfare

check.[3]  Captain Bartlett told Sergeant Neal about the polygraph interrogation, that Mr. Snider

believed he had discovered Sergeant Neal's boot prints on his property and that Sergeant Neal was

involved in a government conspiracy against him.  Prior to visiting Plaintiffs' home, Sergeant Neal

reviewed the logs of Deputies Hampton and Crowley who had responded to Mr. Snider's call on

May 27, 2005.  He also spoke with both deputies and learned that Mr. Snider had allegedly told them

that the CIA was spying on him and getting into his attic.  The deputies also told Sergeant Neal that

Mr. Snider had made a video recording of the prowlers but that he had not had a chance to go

through the tapes in order to show them, and that Mr. Snider suspected his wife of drugging him in

order to have sex with other men.  After gathering this information, Sergeant Neal and Deputy Evans

went to the Snider home to perform the welfare check.

Sergeant Neal and Deputy Evans arrived at the Snider home at roughly 5:00 p.m.  They

---

[2]Mr. Snider believed, erroneously, that one of the deputies that responded to his May 27, 2005 call was named Van Zandt.

[3]A welfare check is a follow up investigation into the well-being and safety of persons who have made calls or complaints to the Sheriff's office.

introduced themselves and, at some point, asked Mr. Snider to let them see his concealed weapon permit and driver's license in order to ascertain the threat of a concealed weapon and to identify Mr. Snider. Mr. Snider left the officers outside while he retrieved the documents. After identifying Mr. Snider, Sergeant Neal asked to speak with Mrs. Snider. Mr. Snider again entered the home alone and returned with Mrs. Snider. Mrs. Snider advised Sergeant Neal that Mr. Snider was under a lot of stress due to, *inter alia*, his father's terminal cnacer and their marital stress among other things. Sergeant Neal asked Mrs. Snider if she feared for her life, and she replied that she did not.

Later, Mr. Snider stated that he would call and have the videotapes of the prowlers brought to the house for the officers. Sergeant Neal stated that prior to entering the home he would need to secure Mr. Snider's concealed handgun for officer safety. When the officers entered the home, two rifles were on the kitchen table and visible from the front door. The officers inquired about other guns in the home, and Mrs. Snider told them there were several additional guns throughout the house. Sergeant Neal directed Mrs. Snider to assist Deputy Evans in securing the other guns; i.e., removing their magazines and clearing their chambers. All but one of the fifteen guns was immediately ready to fire. At this point, Plaintiffs' four year old daughter walked into the kitchen where the fully loaded and chambered rifles had been.

Realizing that Plaintiffs had left their four year old daughter unattended in the house with loaded and chambered firearms for several minutes while they were outside speaking with the officers, and based on information the officers had regarding Mr. Snider's stress level, Sergeant Neal informed Plaintiffs that he could seek an Emergency Order of Detention ("EOD") based on what he had observed and what had been said about Mr. Snider's mental stability. He explained that an EOD could result in involuntary commitment of Mr. Snider, which would automatically terminate his

concealed weapons permit permanently.  Sergeant Neal also informed Mr. Snider that he would also have to notify the Department of Human Services ("DHS") because of the loaded firearms, so that DHS may determine whether Plaintiffs' daughter should be temporarily removed from the home for her safety.  Plaintiff's assert that they viewed Neal's statements as a threat and believed that they had to comply or risk being arrested.

Rather than seek an EOD and contact DHS, Sergeant Neal offered Plaintiffs an alternative. Sergeant Neal suggested that Mr. Snider voluntarily permit the officers to take the guns until such time as Mr. Snider secures a release from a mental health professional.  Sergeant Neal advised Mr. Snider that this alternative would permit him to retain his concealed weapon permit and alleviate any concerns for his daughter's safety.  Plaintiffs consented; the firearms were inventoried and placed in the police car.  Plaintiffs demanded and received a copy of the inventory with both officers' signatures.

Plaintiffs filed the instant action asserting various state law tort claims, including false arrest and replevin claims, against all Defendants, civil rights claims premised on alleged violations of the Fourth and Fourteenth Amendments against Sergeant Neal and Deputy Evans, and claims pursuant to Okla. Stat. tit. 19 § 547 against Defendant, A. T. Brixey ("Brixey").  Defendants seek summary judgment on all of Plaintiffs' claims.

II.     SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law" that is "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *19 Solid Waste Dep't Mechs. v. City of Albuquerque*, 156 F.3d 1068, 1071-72 (10th Cir. 1998) (internal

4

citations and quotations omitted).  When deciding whether summary judgment is appropriate, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in their favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255; *Simms v. Okla. ex rel. Dep't of Mental Health*, 165 F.3d 1321, 1326 (10th Cir. 1999).

At the summary judgment stage the Court's function is not to weigh the evidence, but to determine whether there is a genuine issue of material fact for trial.  *Willis v. Midland Risk Ins. Co.*, 42 F.3d 607, 611 (10th Cir. 1994).  "An issue is genuine if, [viewing the full record] there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248).  "The mere existence of a scintilla of evidence in support of the [Plaintiff]'s position is insufficient to create a dispute of fact that is 'genuine' . . . ." *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997).  "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *See Adler*, 144 F.3d at 670 (citing *Anderson*, 477 U.S. at 248). Where the undisputed facts establish that a plaintiff cannot prove an essential element of a cause of action, defendant is entitled to judgment on that cause of action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), *cited in Rocking Chair Enters., LLC v. Macerich SCG Ltd. P'ship*, 407 F. Supp. 2d 1263 (W.D. Okla. 2005).

III.    DISCUSSION

A.    Tort Claims[4]

---

[4]Plaintiffs assert that because replevin may sound in tort or in contract, the Oklahoma Governmental Tort Claims Act ("GTCA") does not apply to their replevin claims. "[U]nder the Oklahoma statute the replevin action may be for recovery of the property, a judgment for possession or the value if delivery is not possible, or damages for the detention of the property.  Thus, the statutory remedy sounds in both tort and in contract.  That part of the statutory remedy which

The GTCA provides, in pertinent part:

> The state, its political subdivisions, and all of their employees acting within the scope of their employment, whether performing governmental or proprietary functions, shall be immune from liability for torts.

Okla. Stat. tit. 51 § 152.1(A).  The GTCA further provides:

> The state, only to the extent and in the manner provided in this act, waives its immunity and that of its political subdivisions. In so waiving immunity, it is not the intent of the state to waive any rights under the Eleventh Amendment to the United States Constitution.

Okla. Stat. tit. 51 § 152.1(B).

Further, section 155(6) of the GTCA provides, in pertinent part, "[t]he state or a political subdivision shall not be liable if a loss or claim results from . . . (6) . . . failure to provide, or the method of providing, police, law enforcement or fire protection."  Okla. Stat. tit. 51, § 155(6).

Defendants assert that, given the relationship of the deputies to Plaintiffs, any injury suffered by Plaintiffs was a result of the County's method of providing police protection thereby making Defendants immune from suit under section 155(6) of the GTCA.  In *Salazar*, the Oklahoma Supreme Court discussed "protection" within the scope of § 155(6) as follows:

> "Protection" serves as the key word for the textual analysis of the critical sentence quoted here from subsection 6. The exemption in that subsection is invocable when the tort arises while a municipality

---

provides for recovery of possession by replevin sounds in tort and that part which provides for damages for the value is traceable to the common law writ of trover, also a tort.  On the other hand, the remedy for damages for the detention of the property sounds in contract via detinue."  *Gibson v. Copeland*, 13 P.3d 989, 992 (Okla. Civ. App. 2000) (internal citations omitted).

In this case, Plaintiffs assert that issues of detention are not relevant and that, if delivery cannot be made, Plaintiffs are entitled to a judgment for the value thereof.  Further, in the Petition Plaintiffs pray for the immediate delivery of the property or damages for the value of the property.  As such, the Court finds that Plaintiffs replevin claims sound in tort and not in contract and that, therefore, the GTCA does apply to such claims.

6

is rendering services that fall into some category of police protection, law enforcement protection or fire protection. In short, a governmental subdivision is not liable for deficiency of protective services extended by its police, law enforcement or fire fighting components.

*Salazar v. City of Okla. City*, 976 P.2d, 1056, 1066 (Okla. 1999).

Having carefully considered the parties' submissions, and the applicable law, the Court finds that the officers' actions fall within the category of police and/or law enforcement protection and that, as such, § 155(6) of the GTCA applies in this case. Further, the Court finds that the language of the subject provision plainly precludes liability on the part of Defendants for the torts alleged in the complaint. Okla. Stat. tit. 51, § 155(6); *see Myers v. Okla. County Bd. of County Commissioners*, 151 F.3d 1313, 1320-1321 (10th Cir. 1998); *Schmidt*, 943 P.2d at 597-98.

The Court, therefore, finds that all Defendants are immune to liability pursuant to section 155(6) and are, thus, entitled to summary judgment as to Plaintiffs' tort claims.

B.     False Arrest Claim[5]

Plaintiffs assert that the GTCA does not apply to their false arrest tort claims.  In order to prevail on their false arrest claims, to the extent the GTCA does not apply to such claims, Plaintiffs must prove that the officers arrested Plaintiffs without probable cause. *Overall v. State ex rel. Dep't of Pub. Safety*, 910 P.2d 1087, 1091 (Okla. Ct. App. 1995).  The Court has determined in section

---

[5]Plaintiffs also assert false imprisonment claims.  The Oklahoma Supreme Court has made clear that the only distinction between false imprisonment and false arrest is the nature of the person doing the detaining.  If that person is purportedly acting with the authority of law, the tort is false arrest, otherwise, it is false imprisonment. *See Alsup v. Skaggs Drug Ctr.*, 223 P.2d 530, 533 (Okla. 1949).  Here, Plaintiffs allege they were improperly detained by law enforcement personnel. Accordingly, Plaintiffs' claims are properly analyzed as false arrest claims. *See Delong v. State ex rel. Okla. Dep't of Public Safety*, 956 P.2d 937, 938 (Okla. Civ. App. 1998).

C, *infra*, that Plaintiffs were not "seized" within the meaning of the Fourth Amendment and that even if they were, such seizure was reasonable and, therefore, no constitutional violation occurred when the officers temporarily restricted Plaintiffs' movements.  Accordingly, the Court finds that Plaintiffs' false arrest claims must fail and that all Defendants are entitled to summary judgment with respect thereto.

C.      Section 1983 Claims

Plaintiffs assert that Defendants Neal and Evans "seized" them in violation of the Fourth Amendment.[6]  Defendants Neal and Evans assert that they are entitled to qualified immunity as to Plaintiffs' section 1983 claims.  "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Maestas v. Lujan*, 351 F.3d 1001, 1007 (10th Cir.2003).  "Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Lybrook v. Members of the Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000). Defendants' entitlement to qualified immunity turns upon a two-part inquiry: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right," and (2)  "whether the right was clearly established" at the time of the alleged conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Phillips v. James*, 422 F.3d

---

[6]Plaintiffs also assert a general Fourteenth Amendment due process claim.  However, the general due process clause of the Fourteenth Amendment should only be utilized when there is no explicit textual source of constitutional protection.  *See Graham v. Conner*, 490 U.S. 386, 393-95 (1989).  The Court finds that the rights Plaintiffs allege were violated are explicitly protected by the Fourth Amendment and that, as such, the Fourteenth Amendment due process clause is inapplicable.

1075, 1080 (10th Cir.2005).  Plaintiffs "bear the burden of (1) coming forward with sufficient facts to show that the defendant's actions violated a federal constitutional or statutory right and (2) demonstrating that the right violated was clearly established at the time of the conduct at issue." *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998) (internal citations omitted).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. Amend. IV.  Its "central requirement" is one of reasonableness.  *See Texas v. Brown*, 460 U.S. 730, 739 (1983).  Therefore, Plaintiffs must come forward with sufficient facts to show that Defendants' actions constituted a "seizure," and (2) the seizure, if one occurred, was unreasonable. *White v. City of Markham*, 310 F.3d 989, 993 (7th Cir. 2002).

In this case, Plaintiffs contend that they were seized in violation of the Fourth Amendment. Specifically, they assert that Mr. Snider was seized because his movement was temporarily restricted while Mrs. Snider went throughout the house gathering Mr. Snider's guns.  Further they allege that Mrs. Snider was seized because she was required to go through the house gathering the guns.  The fact that Plaintiffs' movements were restricted in some manner, even where immediate arrest is threatened, does not mean that they were seized within the meaning of the Fourth Amendment. *White*, 310 F.3d at 994; *Florida v. Bostick*, 501 U.S. 429, 436-37 (1991); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("[C]haracterizing every street encounter between a citizen and the police as a "seizure," while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices.").  Rather, in analyzing a situation where a suspect was restricted in some manner, but did not attempt to leave, the Supreme Court has identified a number of factors that might suggest that

a seizure has occurred, including: (1) the threatening presence of several officers, (2) the display of a weapon by an officer, (3) some physical touching of the person of the citizen, or (4) the use of some language or tone of voice indicating that compliance with the officer's request might be compelled. *See Mendenhall*, 446 U.S. at 554.  Additionally, even where a seizure occurs, whether or not it is reasonable is determined under traditional reasonableness standards by balancing the individual's privacy interests against the legitimate governmental interests under the totality of the circumstances. *Wyoming v. Houghton*, 526 U.S. 295, 299-300 (1999); *see Ill. v. McArthur*, 531 U.S. 326, 331-34 (2001) (holding that preventing a man from entering his own home without officers accompanying him while they waited for a search warrant did not violate the Fourth Amendment as it was a reasonable seizure under the totality of the circumstances).

Having reviewed the parties' submissions, the Court finds that Plaintiffs were not seized within the meaning of the Fourth Amendment.  Specifically, the Court finds that although Plaintiffs assert that the deputies were rude and that Plaintiffs took Sergeant Neal's statements as threats, the *Mendenhall* factors weigh against finding that Plaintiffs were seized.  Specifically, there were only two police officers involved, the officers were present at the behest of Mr. Snider to check on his welfare in the face of his concern about prowlers on the property, and there is no allegation that the officers touched either Plaintiff or drew their weapons.

Additionally, even if Plaintiffs had been seized, the Court finds that, under the totality of the circumstances, any such seizure was reasonable and that, as such, no constitutional violation occurred. *Wyoming v. Houghton*, 526 U.S. 295, 299-300 (1999).  Specifically, the Court finds that where, as here, law enforcement officers respond to an individual's request for investigation of prowlers on their property and find that the individual appears to be mentally unstable, it is

reasonable to require that individual to temporarily surrender his weapon in order to protect the officers' safety, which is a legitimate governmental interest. *See Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (officer safety is a "legitimate and weighty" government interest); *see also United States v. King*, 990 F.2d 1552, 1561-62 (10th Cir. 1993) (lawful possession of firearm had no bearing on reasonableness of officer's actions because "a legally possessed weapon presents just as great a danger to [officer] safety as an illegal one"). Having carefully reviewed the parties' submissions, the Court finds that Plaintiffs' interest in not having their movements temporarily restricted is clearly outweighed by the government's interest in protecting the officers' safety and that, therefore, the temporary restrictions on Plaintiffs' movements were reasonable.

Accordingly, the Court finds that Plaintiffs have failed to satisfy their burden of showing that a constitutional violation occurred, and that Defendants Neal and Evans are, therefore, entitled to qualified immunity on Plaintiffs' section 1983 claims.

D.      Sheriff's Liability Pursuant to Okla. Stat. tit. 19, § 547

Plaintiffs allege that Defendant Brixey may be held liable pursuant to 19 Okla. Stat. tit. 19, § 547 for the acts of his deputies. In relevant part that statute provides "The sheriff shall be responsible for the official acts of the undersheriff and deputy sheriffs . . . ." As the Court has previously found that Sergeant Neal and Deputy Evans are not liable to Plaintiffs on any of Plaintiffs' claims, the Court finds that there can be no liability on the part of Defendant Brixey under this statute. Accordingly, the Court finds that Defendant Brixey is entitled to summary judgment on all of Plaintiffs' claims premised on § 547.

IV.     CONCLUSION

For the reasons set forth in detail above, the Court finds that "Defendant Board of County

Commissioners of Lincoln County's Motion for Summary Judgment" [docket no. 35], "Defendants'

David Neal and Chris Evans' Motion for Summary Judgment" [docket no. 36], and "Defendant A.T.

Brixey, Sheriff of Lincoln County, Oklahoma's Motion for Summary Judgment" [docket no. 37]

should be, and hereby are, GRANTED.

**IT IS SO ORDERED this 27th day of September, 2006.**


_____
VICKI MILES-LaGRANGE
UNITED STATES DISTRICT JUDGE